**2025 IL 130067**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 130067)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
MATTHEW SMITH, Appellee.

*Opinion filed October 2, 2025.*

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, Cunningham, and Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant Matthew Smith appealed his conviction for first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)). The appellate court reversed and remanded for a new trial, finding that the Cook County circuit court violated defendant's right to a public trial when it excluded his mother from the courtroom. 2023 IL App (1st) 181070. We conclude that defendant's right to a public trial was not violated,

review other errors he challenges, and ultimately reverse the appellate court judgment, affirm defendant's conviction, and remand for the appellate court to determine the issues it left unresolved.

¶ 2                                           BACKGROUND

¶ 3          Defendant was arrested and charged with a murder that occurred in the parking lot outside the Press Box bar in the early morning hours of August 11, 2012. Prior to a jury trial, defendant filed a motion *in limine* to suppress the eyewitness identifications from the two lineups in which defendant participated. The motion does not distinguish between the two lineups but argues that the lineup procedure was unduly suggestive. The trial court held a hearing on the motion. Harvey Police Department Deputy Chief Jason Banks testified that he was a detective on August 11, 2012, and conducted two lineups on that date. Banks testified to the procedures used for the lineups. He attempted to locate fillers who looked similar to defendant, who was 16 years old, stood 5 feet, 7 inches, and weighed 145 pounds. Because defendant was a juvenile, Banks looked for fillers who were as close as possible in age but did not use other juveniles because he would have to obtain their parents' permission. In the first lineup, the fillers were 5 to 13 years older than defendant with weights ranging from 145 pounds to 200 pounds. Banks did not testify to the fillers' heights. No one had a mohawk hairstyle; one filler wore his hair in braids, and the other three individuals had low, natural hair. None of the fillers were wearing sleeveless shirts. One had on a long-sleeved shirt, one wore two shirts including an orange one, and another filler wore a black shirt, while the other wore a white T-shirt. All the fillers were medium to medium-brown complected. In the second lineup, the fillers ranged in age from 5 to 14 years older than defendant. The first filler was 5 feet, 6 inches, weighed 175 pounds, and wore a white shirt. The second filler was 5 feet, 7 inches, weighed 149 pounds, and was dressed in a black and blue plaid shirt. The third filler was 5 feet, 8 inches, weighed 150 pounds, and wore a gray hoodie. The final filler was 5 feet, 10 inches, weighed 145 pounds, and wore a white shirt. As in the first lineup, the fillers had medium to medium-brown complexions.

¶ 4          The first lineup was viewed by only one eyewitness, and the second lineup, later the same day, was viewed by three eyewitnesses. Defendant was identified in both

lineups as the shooter. Defendant was wearing a white tank top in the first lineup, and in the second lineup he was wearing a red and white shirt that eyewitnesses described the shooter as wearing. Banks testified that the red and white shirt belonged to defendant. He did not know why defendant wore it for the second lineup. The trial court denied defendant's motion to suppress the identifications, finding that there was nothing suggestive in the lineup procedures. In part, the trial court found that everyone in the lineups was dressed differently and there was "nothing that would jump out" to cause an improper identification.

¶ 5        Defendant filed a second motion *in limine*, seeking to exclude a photograph taken in the bar the night of the shooting, arguing that its prejudicial effect outweighed any probative value. Defendant contended that the photograph prejudicially showed him and other people in the photograph flashing gang signs. At the hearing on defendant's motion, the State responded that it was seeking only to introduce the photograph that was taken in the bar on the night of the shooting and found with defendant's belongings when he was arrested for identity purposes and maintained it would not use the photograph as gang-related evidence. Defense counsel also described the photograph as "taken at the club, which was the site of the shooting." In response to the court's inquiry as to where the photograph was taken, defense counsel again replied, "[i]n the club." The State maintained the photograph was taken "that night in the club" and "the night of the shooting" and showed defendant in the red and white shirt. Defense counsel responded that defendant was not contesting that he was "wearing that shirt in the club. We will admit to that." Counsel reiterated, "He was wearing the shirt in the club." The trial court found that the photograph was admissible as probative in that it showed defendant was wearing the red and white shirt "earlier that day." The trial court denied defendant's motion *in limine*.

¶ 6        Also prior to trial, defense counsel acknowledged that both parties had requested that all witnesses be excluded from the courtroom, but the defense sought an exception for defendant's mother, who was listed as a possible witness for the State. Defendant was a minor at the time of the offense, so his mother was present at the police station before and during questioning, and the electronic recording of defendant's interview depicted an interaction between defendant and his mother before he decided whether to speak with police officers. The State argued that defendant's mother was an unlikely witness but she was still a possible witness.

Defense counsel contended that the entire interaction between defendant and his mother was recorded, so it would not be necessary to call her as a witness. The trial court denied defendant's motion, ruling that, because defendant's mother was a possible witness, no exception would be made to allow her to remain in the courtroom. The court asked the State to inform it when defendant's mother was no longer a potential witness, at which time she would be allowed in the courtroom.

¶ 7    The jury trial ensued. Arlanza Townsend testified that he arrived at the Press Box at approximately 11 p.m. on August 10, 2012, at the request of his friend, the victim, Kevin Guice. Guice was the president of a social club that was having its anniversary party at the Press Box that night. Townsend drove his own vehicle and parked in the unpaved lot located north of the paved Press Box parking lot. There were about 150 people socializing in the bar with music playing. Townsend did not drink alcohol that night. At some point, Guice went into the deejay booth and stopped the music, requesting a moment of silence for a deceased social club member. Townsend heard a voice say "Fuck your club member. Play the music." After that, there was a confrontation and a fight. Guice was still in the deejay booth, asking everyone to calm down. One of the security guards dispersed pepper spray, and the crowd quickly exited the Press Box. Townsend spoke to Guice outside the bar as Townsend was heading to his vehicle. Townsend could not leave the parking lot because his vehicle was blocked in by other vehicles. As Townsend sat waiting in his vehicle with his headlights on, he observed a man in a red shirt retrieve a silver gun from a vehicle one or two car lengths in front of Townsend's vehicle. The man in the red shirt fired the gun once or twice toward Townsend's left, but Townsend could not see at whom the man was firing and did not see Guice get shot. The recoil from firing the gun pushed the shooter back, but he was braced against another car and did not fall down. Townsend identified defendant in the first lineup later that morning as the man who fired the shots. Townsend also identified defendant in court as the shooter.

¶ 8    Latrice Perdomo testified she was the vice president of the same social club for which Guice was the president. Perdomo arrived at the Press Box around 8:30 or 9 p.m. on August 10, 2012. About 25 of the patrons of the Press Box that evening were members of the social club, and the other 80 or so people in attendance were not members. Perdomo testified that she did not drink any alcohol that night. Around 1 a.m., Guice asked for a moment of silence for the deceased club member.

A male, who was not part of the social club, yelled "Fuck that bitch," and a fight ensued. Guice helped Perdomo exit the building, leading her to the unpaved parking lot. Perdomo saw someone in a gray shirt in the back of the unpaved lot holding his arm up and shooting a gun into the air. Then a boy ran up and pulled a silver gun out and fired at Guice from about five feet away. The force of the gun jerked the boy back, and he fired two more shots. Guice fell to the ground and Perdomo observed that Guice had been shot in the head. Perdomo testified that the shooter had a mohawk hairstyle and was wearing a white, red, and blue button-up shirt with a white tank top underneath. Perdomo identified defendant as the shooter in the second lineup. On cross-examination, she admitted that defendant was the only one in the lineup wearing a red shirt and with a mohawk haircut. On redirect examination, she explained that she picked defendant out because she recognized him as the shooter, not because of his red and white shirt or his mohawk hairstyle. Perdomo also identified defendant in court.

¶ 9        Salenthia Davis, a member of the social club, attended the party at the Press Box, arriving around 9:30 p.m. Davis testified that, when Guice asked for a moment of silence, a "brown, skinny guy with a Mohawk, with a red and white shirt on" stated: "Fuck that. You're not going to have a moment. I'm not trying to hear it." Davis identified that person as defendant in the second lineup and in court. On cross-examination, Davis testified that she went to the Harvey police station after the incident and spoke with Banks, attempting to recount the events that had occurred in the Press Box. When asked if she identified the man who was disrespectful, Davis testified that she did not because Banks never asked her for a description. Davis did not see the shooting in the parking lot.

¶ 10        Aaliyah Ali testified that she arrived at the Press Box for the social club's anniversary party at around 10:45 p.m. on August 10, 2012. Ali recounted that obscenities were said after Guice asked for a moment of silence, but she did not see who made the statements. As fighting in the bar began, Ali exited the building. Her vehicle was parked in the unpaved parking lot, but while she was still directly outside the Press Box facing the unpaved lot, she saw an individual in a red and white shirt and with a mohawk hairstyle, whom she identified as defendant, point a gun at and shoot Guice. Ali identified defendant in both the second lineup and in court.

¶ 11    The medical examiner testified that Guice died from a gunshot wound to the head.

¶ 12    Sergeant Cary Morin, a crime scene investigator for the Illinois State Police (ISP), processed the crime scene at the Press Box. Morin recovered .380-caliber shell casings that were likely from a semiautomatic handgun, although such a gun was never recovered. Morin also processed a silver Buick Regal about a mile north of the Press Box and identified the firearm that was recovered from that vehicle as a Smith & Wesson .357 Magnum revolver.

¶ 13    Mary Wong, a forensic scientist with the ISP, testified as an expert in primer and gunshot residue analysis. She testified that, in accordance with her training with the ISP, a positive finding for primer gunshot residue required three "tri-component" particles. Wong tested both of defendant's hands and two areas of his shirt, and he did not test positive for gunshot residue. In response to State questioning and over defense counsel's objection, Wong testified that some outside laboratories allow a positive gunshot residue finding based upon a single tri-component particle. Wong found a single tri-component particle on defendant's right hand. Wong also testified that some labs require four particles to be considered positive for gunshot residue. ISP, though, sets its baseline at three tri-component particles in order to be scientifically correct, based upon a validation study where a one tri-component particle analysis returned a false positive.

¶ 14    Nicole Fundell, a forensic scientist specializing in firearms examinations with the ISP, testified that she received six .357 Magnum cartridge casings, which were recovered from the Smith & Wesson revolver found in the vehicle from which defendant fled. She could not match bullet fragments recovered from Guice's body with the recovered Smith & Wesson revolver but could not exclude that one of the fragments was fired from the Smith & Wesson. She concluded that the .380-caliber cartridge casings and a bullet jacket also recovered from the crime scene were not fired from the Smith & Wesson revolver.

¶ 15    Gregory Williams, an officer with the Harvey Police Department, was dispatched to the Press Box at approximately 1:28 a.m. on August 11, 2012. Upon arriving, he found a large crowd of approximately 100 people in the parking lot. Several people were pointing at a fleeing silver Buick. Williams followed the Buick, which was traveling in a reckless manner at a high rate of speed. The vehicle

abruptly stopped about four blocks from the Press Box, and a male wearing a white tank top and tan pants exited from the front passenger seat and fled on foot. Williams chased and apprehended him. Williams returned to the Buick and found a silver revolver handgun on the floor of the passenger side. Williams identified the revolver as the Smith & Wesson that was admitted into evidence. Williams also identified defendant as the fleeing person he apprehended.

¶ 16    Harvey police officer Daniel Walz also followed the Buick. Walz testified that, while Williams chased the front seat passenger, Walz secured the driver and the rear seat passenger. Walz also identified the handgun that was recovered from the front passenger floor of the vehicle as the Smith & Wesson revolver that was admitted into evidence. Walz further searched the Buick and recovered a red and white shirt, identified in court, from the center front floorboard of the vehicle.

¶ 17    Officer Dominique Randle-El was the booking officer for the Harvey Police Department on August 11, 2012. He testified to the property that was in defendant's possession when he was arrested. That property included defendant's belt, shoelaces, a photograph, a fake identification card, money, jewelry, and a cell phone.

¶ 18    Banks testified that he prepared the lineups and his description of the procedure for the lineups was consistent with the description he gave at the hearing on the pretrial motion to suppress. He acknowledged that defendant was the only person in the second lineup who was wearing a red and white shirt and with a mohawk hairstyle. Banks confirmed that defendant was wearing a white tank top in the first lineup and a red and white shirt in the second lineup and that defendant was in custody during the time between the two lineups. He did not provide an explanation to the jury as to why defendant wore the red and white shirt in the second lineup.

¶ 19    After the State rested and the trial court denied defendant's motion for a directed verdict, defendant made the decision not to testify. At that point, defendant's mother was allowed into the courtroom. The defense submitted a stipulation that Sharon T. McClain, a court reporter on December 1, 2015, would testify regarding the testimony of responding officer Williams regarding crowd size at the Press Box. The defense called only one witness, Deborah Hansen, a former investigator at the Cook County Public Defender's Office. She interviewed eyewitness Davis, who said three men ran from the bar and described that one was tall with dreadlocks,

that one was wearing a blue flannel shirt and jeans, and that she could not describe the third man. The defense rested.

¶ 20 The State's exhibits, including the photograph, were admitted into evidence without objection. The parties discussed a number of the exhibits, debating which would be sent to the jury to be considered during deliberations. Defense counsel objected to the exhibit that contained the photograph and other items that were recovered from the defendant when he was arrested. The court found that there was no evidence introduced about the photograph, specifically where and when it was taken, other than that it was found with his belongings when he was arrested. Because there was no other foundation for the photograph, the court ruled it would not be provided to the jury. The parties agreed that the remainder of defendant's personal property could be sent to the jury.

¶ 21 The matter proceeded to closing arguments. During the State's rebuttal closing arguments, after defense counsel characterized the case as a "whodunit," the State argued:

"[PROSECUTOR]: *** In addition to this being a whodunit, it assumes two things. One, that we completely disregard what these four people testified to; and, two, let's not mince words, in order for you to find him not guilty, you have to find that what they're saying is that all four people lied, lied to your face. That is what you have to find."

[DEFENSE COUNSEL]: Objection.

THE COURT: Objection is overruled.

[PROSECUTOR]: Let's not mince words. That's exactly what they want you to believe.

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]: They lied.

THE COURT: Objection is overruled. It's argument."

The State further argued that "[t]he only way this is whodunit is if you ignore the testimony that you have, if you find the four people who were in front of you liars."

¶ 22    Jury deliberations began. The jury sent a note asking: "Photo taken inside bar?" In response to the note, defense counsel argued the photograph found with defendant's property was prejudicial but also argued that there was no evidence that the photograph was taken in the bar, so it was not clear what photograph the jury was requesting. Over defendant's objection, the court stated that the photograph was admitted into evidence as part of defendant's property with him when he was arrested and defendant signed the acknowledgement that it was his property. The court found the photograph to be probative. The court determined the foundation was that it was property on defendant's person when he was arrested and it did not matter that there was no foundation provided for when it was taken. The trial court did not submit a written response to the jury but merely sent the photograph to the jury.

¶ 23    Following deliberations, the jury found defendant guilty of first degree murder and further found the State had proven that defendant was armed with a firearm and personally discharged it.

¶ 24    Defendant filed a motion for a new trial, which was amended, arguing, *inter alia*, that (1) he was denied his right to a public trial by the exclusion of his mother from the courtroom, (2) the trial court erred in denying his motion to suppress the lineups, (3) the State violated discovery rules by eliciting testimony regarding the gunshot residue test, (4) the State made improper arguments at closing, and (5) the trial court erred in sending the photograph to the jury in response to the jury's question. The trial court denied the motion and sentenced defendant to 30 years in prison.

¶ 25    On appeal to the appellate court, defendant argued that (1) his right to a public trial was violated when his mother was excluded from the courtroom, (2) evidence of the lineup identifications should have been suppressed because the lineups were unduly suggestive, (3) the State elicited improper testimony on gunshot residue testing, (4) the photograph provided to the jurors during deliberations deprived him of a fair trial, and (5) closing statements were prejudicial. 2023 IL App (1st) 181070, ¶ 1. The appellate court reversed defendant's conviction on the first issue and remanded for a new trial. *Id.* ¶ 29. It concluded that defendant was denied his right to a public trial and such a violation was a structural error. *Id.* ¶ 28. It found that the trial court implicitly applied the factors set forth in *Waller v. Georgia*, 467

U.S. 39 (1984), concerning the right to a public trial. 2023 IL App (1st) 181070, ¶ 23. The appellate court found that the State failed to show that there was a reasonable probability that defendant's mother would actually testify and described the State's posited reasons as "far-fetched." *Id.* ¶ 24. Thus, the appellate court concluded the record failed to support findings that would satisfy the exclusion of defendant's mother under the *Waller* test. *Id.*

¶ 26    After determining the first issue was dispositive, the appellate court went on to discuss the four other issues raised by defendant. *Id.* ¶ 30. In doing so, the court reasoned that such discussion would provide guidance to the trial court on remand. *Id.* It found the second lineup where defendant was wearing the red and white shirt was unduly suggestive and vacated the trial court order denying the motion to suppress the second lineup. *Id.* ¶¶ 42-43. The court also found that the State violated discovery rules with respect to the gunshot residue expert by eliciting testimony that contradicted the expert's disclosed report. *Id.* ¶ 53. It further concluded that the State made improper remarks in its closing argument, but the appellate court did not determine if the remarks were egregious enough to warrant a new trial, as it had already determined defendant was entitled to a new trial based on the violation of his right to a public trial. *Id.* ¶¶ 58-59. Lastly, the court determined that sending the photograph to the jury in response to its query was an error because it improperly filled in evidentiary blanks. *Id.* ¶ 64.

¶ 27    The State filed a petition for leave to appeal challenging the appellate court's findings, which we granted. We also granted defendant's motion for leave to file a corrected brief to address citation errors.[1]

---

[1]Although the corrected brief has significantly improved the accuracy of the citations of caselaw offered by the appellant in support of his arguments on appeal, we take this opportunity to caution counsel that the obligations set forth in the Rules of Professional Conduct, notably Rule 3.1 (Ill. R. Pro. Conduct R. 3.1 (eff. Jan. 1, 2010)) and Rule 3.3 (Ill. R. Pro. Conduct R. 3.3 (eff. Jan. 1, 2010)), extend to all representations made to a tribunal.

¶ 28                                              ANALYSIS

¶ 29          The question before us is whether defendant was denied a fair trial by various
         errors he alleged were committed by the trial court. We begin with the issue on
         which the appellate court decided the case: whether the trial court violated
         defendant's right to a public trial by excluding his mother from the courtroom
         during parts of the trial proceedings, including jury selection, opening statements,
         and the presentation of the State's case-in-chief. The State argues that excluding a
         potential witness from the courtroom does not implicate, let alone violate, a
         defendant's right to a public trial. In response, defendant argues that his mother was
         not a witness and therefore her exclusion from the trial resulted in structural error.
         Upon review, we agree with the State and find that exclusion of defendant's mother
         from the courtroom did not implicate defendant's public trial right or deny him a
         fair trial.

¶ 30          The right to a public trial is enshrined in our federal and state constitutions. See
         U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The protections conferred by
         the public trial right are to (1) ensure a fair trial, (2) remind the prosecutor and judge
         of their responsibilities to the accused and the importance of their functions,
         (3) encourage witnesses to come forward, and (4) discourage perjury. *Waller*, 467
         U.S. at 46; *People v. Radford*, 2020 IL 123975, ¶ 25. The right to a public trial is
         not absolute, and not all courtroom closures are prohibited, nor are they all violative
         of the sixth amendment. *People v. Schoonover*, 2021 IL 124832, ¶ 44. We review
         *de novo* the legal question of whether a courtroom closure violated a defendant's
         public trial right. *Id.* ¶ 19.

¶ 31          Defendant's right to a public trial was not implicated by the trial court's
         exclusion of his mother from the courtroom. At no time did the trial court close the
         courtroom. Although defendant's mother was temporarily excluded, the courtroom
         remained open to the public, including other family members, spectators, and the
         media. In fact, defendant's other family members were in attendance throughout
         the trial. In finding that the trial court erred in excluding defendant's mother, the
         appellate court failed to recognize the critical difference between a defendant's
         right to a public trial and the trial court's authority to exclude witnesses from the
         courtroom. Defendant's mother was excluded from the courtroom not in order to
         hold a secret trial or for other nefarious reasons violative of defendant's public trial

- 11 -

right but because she was a potential witness, the exclusion of which is a common courtroom practice. *People v. Chatman*, 2022 IL App (4th) 210716, ¶ 71 (" 'Exclusion of witnesses from the courtroom during trial is a time-honored practice designed to preclude one witness from shaping his testimony to conform to that of those who preceded him on the stand.' " (quoting *People v. Johnson*, 47 Ill. App. 3d 362, 369 (1977))).

¶ 32    A defendant's right to a public trial is not impacted by the trial court's exercise of its authority to exclude witnesses. In *Radford*, 2020 IL 123975, ¶¶ 41-42, we found that a partial courtroom closure where other spectators, including family members and the media, remained did not violate a defendant's sixth amendment right to a public trial. In *People v. Holveck*, 141 Ill. 2d 84, 101-02 (1990), we found that excluding nonmedia individuals without a direct interest in the case during the testimony of the child victim did not violate the defendant's right to a public trial where the courtroom remained open to the media. In *People v. Taylor*, 244 Ill. App. 3d 460, 467 (1993), the appellate court differentiated between a defendant's public trial right and the trial court's authority to exclude witnesses from the courtroom. It found that the exclusion of the defendant's parents, who were identified as possible witnesses, did not implicate nor violate his right to a public trial. *Id.*

¶ 33    These cases establish that defendant's right to a public trial was not implicated by the trial court's exclusion of his mother from the courtroom. The defense conceded that defendant's mother was a potential witness, a concession supported by the evidence. There is also no dispute that the trial court did not close the courtroom to other family members, spectators, or the media. Because the exclusion of defendant's mother from the courtroom did not affect his right to a public trial, we reverse the appellate court's ruling that the courtroom was improperly closed during defendant's trial based on the exclusion of his mother.

¶ 34    While the appellate court found this first issue dispositive and remanded the cause for a new trial on this ground, it proceeded to address four additional contentions of error that it believed were likely to recur on remand. 2023 IL App (1st) 181070, ¶ 30. The additional four issues are as follows: (1) whether the trial court should have suppressed evidence of the identifications for trial on the grounds that the second police lineup was unduly suggestive (*id.* ¶¶ 32-43); (2) whether the testimony of the gunshot residue amounted to a discovery violation because the

- 12 -

expert's report tendered before trial only disclosed her opinion that she detected an insufficient number of particles to make a positive finding (*id.* ¶¶ 45-56); (3) whether the photograph that appears to show defendant wearing the same red and white shirt described by witnesses with other people making gestures was improperly provided to the jury (*id.* ¶¶ 61-64); and (4) whether the State's closing argument was improper and violated defendant's right to a fair trial (*id.* ¶¶ 58-59). Because the appellate court found it appropriate to address these additional four issues, we, too, will examine each in turn.

¶ 35    First, we look at whether the identifications from the second police lineup should have been suppressed as unduly suggestive. The appellate court found the second lineup to be unduly suggestive; however, the court determined that, when such a finding is made, the burden of proof must shift to the State to show by clear and convincing evidence that the witnesses identified defendant based on their independent recollections. *Id.* ¶ 43. The appellate court concluded that the trial court is better suited to conduct the inquiry into whether the witnesses identified defendant based on their independent recollections. *Id.* Thus, the appellate court simply chose to vacate the trial court's order denying defendant's motion to suppress as to the identifications made in the second lineup. *Id.*

¶ 36    Before us, the State, as appellant, maintains that defendant did not meet his burden to show the second lineup was unduly suggestive. The State primarily argues defendant was wearing his own shirt and thus the lineup identifications were admissible. In response, defendant argues that he was impermissibly spotlighted in the second lineup when wearing the red and white shirt the shooter was identified as wearing by eyewitnesses at the Press Box. He also complains that the other individuals in the second lineup were not suitable "fillers," as they were older and had different hairstyles from what defendant wore.

¶ 37    We will exclude a pretrial identification "only if the identification procedure was unnecessarily suggestive leading to a substantial likelihood of misidentification." *People v. Faber*, 2012 IL App (1st) 093273, ¶ 55. A defendant bears the burden of establishing that the identification procedures were suggestive, and if he does, the burden shifts to the State to show that the witness identified the defendant based on an independent recollection. *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). Where a pretrial identification is "unnecessarily or impermissibly

- 13 -

suggestive so that a very substantial likelihood exists that the offender was irreparably misidentified," its use violates due process. *People v. Ayoubi*, 2020 IL App (1st) 180518, ¶ 29. On a suppression motion, we accept a trial court's factual findings unless they are against the manifest weight of the evidence and review the ultimate legal question of whether suppression is warranted *de novo*. *People v. Bass*, 2021 IL 125434, ¶ 21.

¶ 38    The lower courts considered the discrepancies in the fillers' physical characteristics and found they did not make the second lineup unduly suggestive. We agree. In the second lineup, three fillers were between 5 and 14 years older than defendant, and the fourth filler was 30 years older. No filler had a mohawk haircut. None of them wore a white sleeveless T-shirt or a red and white shirt. Nevertheless, the trial court rejected defendant's claim after viewing the lineup photograph, finding that the fillers did not "look much older than the defendant" and that his mohawk was "not very pronounced. It's not spiky or dyed a different color." The appellate court agreed with the trial court on this point, noting that, "[i]n appearance, the fillers are not grossly dissimilar from [defendant] in these respects" and that the mohawk was "not so pronounced as to amount to spotlighting." 2023 IL App (1st) 181070, ¶ 38. Our viewing of the lineup photographs supports the lower courts' assessment of them. The discrepancies in neither age nor hairstyle stand out to any degree that would result in a misidentification. See *People v. Simpson*, 172 Ill. 2d 117, 140 (1996) (differing hairstyles in lineup do not render it unduly suggestive); *People v. Guest*, 166 Ill. 2d 381, 398 (1995) (age difference in lineup participants did not, by itself, render lineup unduly suggestive). The age, size, and appearance discrepancies in the lineup participants go to the identification's weight and not necessarily its admissibility. *People v. Kavanaugh*, 85 Ill. App. 3d 783, 788-89 (1980) ("claims that there were significant differences between the age, size, and appearance of a suspect and other lineup participants goes to the weight of the evidence and not necessarily to its admissibility"); *People v. Richardson*, 123 Ill. 2d 322, 350 (1988) ("[p]articipants in a lineup need not be physically identical").

¶ 39    In addition to the physical discrepancies of the fillers, in the second lineup, defendant was wearing the red and white shirt, which the eyewitnesses identified the shooter as wearing. The appellate court found this fact particularly significant. 2023 IL App (1st) 181070, ¶ 40. We find our decision in *People v. Johnson*, 149

Ill. 2d 118, 146 (1992), dispositive on the question of whether the identification procedures used in the second lineup were unduly suggestive based on defendant wearing the red and white shirt. The defendant in *Johnson* challenged as suggestive the lineup in which he was identified as the offender. The defendant was wearing a black leather coat, which the eyewitnesses said the offender was wearing. *Id.* We noted several situations in which lineups were so suggestive that they prejudiced the defendant. *Id.* at 147. These included where the witnesses knew everyone in the lineup but the defendant, the others in the lineup looked " 'grossly dissimilar' " to the defendant, the defendant was required to wear the distinctive clothes the suspect wore, the police told the lineup witnesses that they caught the offender and showed the defendant alone or in jail, the police pointed out the defendant to the witnesses before or after the lineup, and the individuals in the lineup were required to try on clothes that only fit the suspect. *Id.* (quoting *United States v. Wade*, 388 U.S. 218, 233 (1967)). We determined that none of those situations were at play in the lineup identification the defendant challenged, and he provided no evidence that he appeared in the black coat by design. *Id.* at 147-48. Rather, defendant was wearing his own clothing. *Id.* at 148. We rejected the defendant's challenge to the identifications, noting that a defendant who wears his own clothes differed from a perpetrator who was ordered to wear an orange coat when all the others in the lineup were made to wear brown coats. *Id.*

¶ 40   In rejecting the defendant's claim that the lineup was unduly suggestive, the *Johnson* court emphasized the "strength of suggestion made to the witness" in determining suggestiveness. *Id.* at 147. The court explained that a lineup is suggestive when, "[t]hrough some specific activity on the part of the police, the witness is shown an individual who is more or less spotlighted by the authorities." *Id.* In the lineup at issue, there is no evidence the police meant to intentionally distinguish defendant from the other individuals in the lineup in order to aid the witnesses in identifying him. The eyewitnesses who identified defendant in the second lineup (Perdomo, Davis, and Ali) all testified the shooter wore a red and white shirt and had a mohawk hairstyle. Townsend, who identified defendant in the first lineup in which defendant was wearing the white tank top, also testified the shooter wore a red shirt. Defendant appeared in the second lineup in the red and white shirt, which was his own clothing and which he admitted he was wearing at the Press Box the night of the shooting. As in *Johnson*, the fact that he wore his own clothing did not make the lineup suggestive. See *Faber*, 2012 IL App (1st)

093273, ¶ 57 (appellate court determined that, without evidence the police spotlighted the defendant, the fact that he wore his own clothes in the lineup was not suggestive); *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (2010) (without evidence the police spotlighted the defendant, there was "no improper influence here where the defendant simply wore his own clothing in the lineup"); *People v. Johnson*, 222 Ill. App. 3d 1, 8 (1991) (lineup was not suggestive where the defendant wore red pants, which witnesses described the offender wearing). Accordingly, we find the second lineup was not suggestive, reverse the appellate court's contrary conclusion, and affirm the trial court's denial of defendant's motion to suppress the lineup identifications.

¶ 41     Second, we review the appellate court's finding that the testimony of the gunshot residue expert, Wong, amounted to a discovery violation because her report tendered before trial only disclosed her opinion that she detected an insufficient number of gunshot particles to make a positive finding that defendant discharged a firearm. Discovery is governed, in part, by Illinois Supreme Court Rule 412(a)(iv) (eff. Mar. 1, 2001)), which requires the State to disclose upon written motion of defense counsel "any reports or statements of experts, made in connection with the particular case" that are "within its possession or control," including results of scientific tests. "[T]he purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation." *People v. Heard*, 187 Ill. 2d 36, 63 (1999). Compliance with discovery rules is mandatory, but reversal for a rule violation is required only where a defendant shows he was prejudiced by the violation. *Id.* Where a defendant, who bears the burden of proof, demonstrates that he was prejudiced by the discovery violation and the trial court failed to eliminate the prejudice, a new trial should be granted. *People v. Lovejoy*, 235 Ill. 2d 97, 120 (2009). Where the facts giving rise to the alleged discovery violation are not in dispute, the issue becomes one of law, which we review *de novo. Id.* at 118.

¶ 42     The appellate court held that "the State violated its discovery obligation by eliciting testimony that contradicted the expert's disclosed report." 2023 IL App (1st) 181070, ¶ 53. Specifically, the court found:

    "Wong's report indicated a negative result for the presence of [gunshot residue]. Yet, the overall effect of her testimony was, despite the negative result, Smith likely fired a gun. The tacit message of testifying that other labs would find a

single particle a positive result is that Wong believes her detection of one particle on Smith was a positive result—she is only prevented from saying so explicitly due to an ISP regulation." *Id.* ¶ 55.

¶ 43   The record reveals that Wong's testimony tacitly contradicted her report, as the appellate court found. Both parties agree that Wong concluded in her report that her analysis did not reveal gunshot residue on defendant sufficient to establish that he discharged a firearm. At trial, Wong testified that, under ISP laboratory rules, "to return a finding" that a sample is "positive" for gunshot residue, she "must find three tri-component particles" on the sample. She further testified that the sample taken from defendant's right hand did not test positive because she only found one tri-component particle on it. According to Wong, her analysis "leads [her] to a conclusion that the kit administered to [defendant] indicates that he may not have discharged a firearm with either hand." An expert cannot definitively say that someone did not fire a gun, however, because, as Wong explained, gunshot residue can be removed in various ways, such as through sweating, certain activities, or the passage of time.

¶ 44   Although Wong presented her conclusion that the gunshot residue analysis did not indicate defendant fired a gun, she then retreated from that conclusion by testifying about the standards other laboratories use. She explained that some laboratories require only one tri-component particle to conclude that a person fired a gun, while other laboratories require four particles. This information was not disclosed as part of Wong's opinion, and the State elicited the testimony without providing any foundation for it, such as identifying the other laboratories and seeking an explanation of how Wong was aware of the other standards. The implication from her testimony was that, because one tri-component particle was discovered on defendant's right hand, she could have found that he discharged a firearm but for the ISP laboratory standard. The testimony suggested to the jury was that, if Wong had worked for a different laboratory, she would have concluded that the one tri-component particle found on defendant's right hand indicated that he had discharged a firearm. This implied conclusion differed from the conclusion she reached in her report, that the gunshot residue analysis did not establish that defendant fired a gun. Wong's undisclosed testimony about other laboratories' standards was a surprise to the defense and left defendant ill-prepared to cross-examine Wong and without an opportunity to call an expert to counter Wong's

explanation about other laboratories' standards. Defendant was without a way to erase the undisclosed testimony from the jurors' minds and could not refute it.

¶ 45        In finding that the State violated its discovery obligations, the appellate court relied on our holding in *Lovejoy*. *Id.* ¶ 53. In *Lovejoy*, 235 Ill. 2d at 113-14, the expert prepared a report before trial stating that a sample taken from a tile in the victim's bathroom tested negative for the presence of blood. At trial, the expert testified that it was a false negative in response to a direct question from the State. *Id.* at 113-14. The discovery violation in *Lovejoy* was that the State did not disclose that the expert intended to interpret the reported result as the opposite of what the report indicated. *Id.* at 119. Like the expert in *Lovejoy*, Wong contradicted the findings in her report with her equivocal testimony regarding the application of gunshot residue standards from other laboratories. Although Wong did not overtly contradict her report conclusion, her undisclosed testimony about the standards of other laboratories suggested she could have found defendant discharged a firearm based on the presence of the one tri-component particle on his right hand if she was not bound by ISP laboratory standards. We agree with the appellate court that "the State violated its discovery obligation by eliciting testimony that contradicted [Wong's] disclosed report." 2023 IL App (1st) 181070, ¶ 53. We further find, however, that this error is not reversible error.

¶ 46        The failure to comply with discovery rules requires reversal where the defendant establishes he was prejudiced by the violation. *Heard*, 187 Ill. 2d at 63. We consider several factors when determining whether a discovery violation warrants a new trial. These factors include "the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice would have helped the defense discredit the evidence." *Lovejoy*, 235 Ill. 2d at 120. Another factor we consider is what remedies the defendant sought for the violation, including whether he sought a continuance. *Heard*, 187 Ill. 2d at 63. Applying the factors to the facts before us, we do not believe a new trial is warranted.

¶ 47        Under the first factor, the evidence against defendant was overwhelming: he admitted he was at the Press Box wearing the red and white shirt the night of the shooting, four eyewitnesses identified him in lineups, he removed his red and white shirt after the shooting, and he fled from the Press Box and from the officers after his vehicle was stopped. As to the second factor, the undisclosed evidence served

to further strengthen the State's case by implying Wong could have testified that the gunshot residue analysis indicated defendant did discharge a gun if she were not bound by the ISP laboratory standards. However, this testimony was mitigated by Wong's ultimate conclusion that the gunshot residue analysis indicated that defendant may not have discharged a firearm. The final factor concerns whether prior notice of the undisclosed topics of Wong's testimony would have allowed the defense to counter it with either its own expert or discrediting cross-examination questions. The State maintains defendant cannot establish prejudice because he failed to request a continuance when Wong presented her surprise testimony. See *People v. Robinson*, 157 Ill. 2d 68, 82 (1993) (discovery violation waived where the defendant failed to seek a continuance). Defendant asserts that any such request would have been futile. He reasons that, even if he had sought a continuance to obtain his own expert, the expert would have reached the same conclusion as Wong reached in her report: that under ISP protocols the gunshot residue analysis on defendant indicated that he may not have discharged a firearm and that other laboratories use different standards in analyzing gunshot residue. Because a continuance would not have corrected the prejudice resulting from the State's discovery violation, defendant's failure to request one does not weigh against him. Based on our application of the above factors, we conclude that, although the State violated its discovery obligations, the error was not reversible error and does not warrant a new trial for defendant.

¶ 48    Third, we look at whether the photograph taken inside the bar that shows defendant, wearing the same red and white shirt described and identified by eyewitnesses and posing with other people making alleged gang gestures, was improperly provided to the jury. At no point in its opinion when examining this issue does the appellate court identify the appropriate standard of review, which is abuse of discretion. See *People v. Hollahan*, 2020 IL 125091, ¶ 11 (holding a trial court's response to the jury's request to view evidence during deliberations is reviewed for an abuse of discretion). Instead, the appellate court simply finds that it was "error" to send the photograph back to the jury in response to the jury question: " 'Photo taken inside bar?' " 2023 IL App (1st) 181070, ¶ 64. The appellate court determined that the act of sending the photograph filled in evidentiary blanks and connected dots for the jury. *Id.* The appellate court reasoned that by sending the photograph to the jury in response to the question, with no

further explanation, the photograph supplied additional evidence not presented at trial: that the photograph was taken at the Press Box the night of the shooting. *Id.*

¶ 49 After reviewing the record and applying the appropriate standard of review, we cannot determine that the trial court abused its discretion in permitting the jury to view the photograph of defendant that was admitted at trial. There is no dispute that the photograph of defendant was recovered with defendant's other belongings when he was arrested. Walz, the police officer who pursued and arrested defendant, testified that he recovered the photograph from defendant's vehicle. Randle-El, the booking officer, identified the exhibit containing defendant's personal property and the property inventory form that listed the photograph. He identified defendant's signature on the prison arrestee property inventory form. The photograph was admitted into evidence with the foundation that it was defendant's personal property when arrested.

¶ 50 The defendant argues, and the appellate court found, that admission of the photograph was improper because there was no information on when or where the photograph was taken. They maintain that, by sending the photograph back to the jury in response to its note, the trial court improperly filled in evidentiary blanks. We disagree. At the hearing on defendant's motion *in limine* to exclude the photograph, defendant's concern was that the photograph showed him and the other men flashing apparent gang signs. Defendant made no objection as to foundation, and defense counsel made several admissions the photograph was taken in the Press Box the night of the shooting. Defense counsel presented the motion as concerning "some photographs that were taken at the club, which was the site of the shooting." In response to the trial court's inquiry about where the photograph was taken, defense counsel responded, "[i]n the club." Defense counsel also stated that defendant "was wearing that shirt in the club. We will admit to that" and "we are not saying he wasn't in the club, and we are not saying he wasn't wearing that very shirt." The trial court rejected defendant's argument that the prejudice from the photograph outweighed its probative value and found the photograph admissible as defendant's personal property.

¶ 51 At the exhibit conference, defendant objected to the photograph going to the jury, again arguing that its prejudice outweighed its probative value. The State argued the photograph was relevant. The trial court ruled the photograph would not

go to the jury because there was no testimony about where the photograph was taken or that it was taken the night of the shooting, even if there was a foundation for its admission as defendant's personal property. After the jury requested the photograph during deliberations, the trial court reversed its prior ruling and sent the photograph to the jury. It found there was a foundation for the photograph as defendant's personal property that was with him when he was arrested. The court noted there was no other foundation for the photograph but it was proper evidence as part of defendant's personal property. It rejected defendant's argument that the photograph was not probative and lacked relevance and a proper foundation because there was no testimony the photograph was taken in the bar the night of the shooting. The trial court said that defendant had only previously objected to the photograph as prejudicial based on the alleged gang signs and had not raised an objection to its foundation. The trial court found the foundation was that it was defendant's personal property, it was probative regarding identity, and its foundation was not based on when the photograph was taken.

¶ 52      In responding to the jury's note, defendant also objected on the basis that it was unclear what photograph the jury was requesting and that providing the photograph to the jury required assumptions that it was taken in the bar, an assumption that lacked foundation. Although there was no trial testimony about where or when the photograph was taken, the record establishes that the parties agreed the photograph was taken in the Press Box the night of the shooting. At the motion *in limine* hearing where defendant sought to exclude the photograph from admission into evidence, defendant described that it was "taken at the club, which was the site of the shooting." In response to the trial court's question as to where the photograph was taken, defense counsel answered, "[i]n the club." Defense counsel said defendant was not contesting that he was "wearing that shirt in the club" or that the photograph was taken at the Press Box the night of the shooting. Furthermore, defendant did not object to the numerous references by the State and the trial court that the photograph was taken at the Press Box.

¶ 53      However, at the exhibit conference and the conference to address the jury note, defendant took the opposite position. He argued that the evidence did not establish that the photograph was taken in the Press Box the night of the shooting. Defense counsel contended that "[w]e don't know where that photo was taken." In response to the trial court's statement the jury was "asking for the photo taken inside the

bar," counsel stated again, "[w]e don't know where that photo was taken" and "[w]e don't know if this photograph was taken in a bar." We find that defendant is precluded from reversing his position and arguing that it was unknown when the photograph was taken after admitting at the motion *in limine* hearing that it was taken in the Press Box the night of the shooting. *People v. Carter*, 208 Ill. 2d 309, 319 (2003) ("Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error."). Had defendant not made the admissions the photograph was taken in the Press Box the night of the shooting, the State could have secured testimony to establish that it was. Because of the defendant's admissions, the State had no need to present any testimony on when the photograph was taken. Considering the above facts, we cannot say that the trial court abused its discretion in permitting the jury to view the admitted photograph of defendant in the bar. Accordingly, we reverse the appellate court's finding of "error" as to this issue. See 2023 IL App (1st) 181070, ¶ 64.

¶ 54   Fourth, we look at whether the State's closing argument was improper and violated defendant's right to a fair trial. The appellate court found the following comments deprived defendant of a fair trial:

"In addition to this being a whodunit, it assumes two things. One, that we completely disregard what these four people testified to; and, two, let's not mince words, in order for you to find him not guilty, you have to find that what they're saying is that all four people lied, lied to your face. That is what you have to find."

and

"The only way this is whodunit is if you ignore the testimony that you have, if you find the four people who were in front of you liars."

¶ 55   For purposes of this appeal, the State does not contest that the prosecutor erred in making the first comment. The State, however, contends that the error was isolated and did not prejudice defendant. As to the second statement at issue, the State maintains that this was permissible argument and, even if error, it could only be reviewed as plain error because defendant did not object to it. The appellate court

found that the two comments were improper but did not reach the issue of whether they entitled defendant to a new trial.

¶ 56    The State is afforded wide latitude in closing argument. *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). In determining whether comments made during closing argument are improper, we consider whether they "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Reversal and a new trial are warranted where the misconduct in closing argument is substantial and the improper comments "constituted a material factor in a defendant's conviction." *Id.* When considering the State's comments in closing argument, we "will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *People v. Jackson*, 2020 IL 124112, ¶ 83. Closing arguments are to be considered in their entirety, rather than focusing on individual remarks. *Id.* ¶ 82. An isolated comment may not be sufficient to prejudice a defendant. *Id.* ¶¶ 85-86 (finding State's mischaracterization of evidence to be isolated remarks that did not rise to reversible error). Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*. *Wheeler*, 226 Ill. 2d at 121.

¶ 57    We address the first challenged comment made by the State, which it concedes was impermissible but contends did not amount to reversible error. *People v. Williams*, 2022 IL 126918, ¶ 49 (State's closing argument comment must be both improper and substantially prejudicially to be reversible error). According to the State, defendant cannot meet his burden to show he was prejudiced by the State's improper comments. We agree. First, we do not focus on individual phrases or remarks but look at the State's closing argument as a whole. *Jackson*, 2020 IL 124112, ¶ 82. Here, the State's improper comment was a single misstatement in a lengthy closing and rebuttal argument. It explained several times that the State bore the burden of proof. *People v. Mudd*, 2022 IL 126830, ¶¶ 44-45 (State's isolated improper comment did not prejudice defendant where State explained multiple times that the burden of proof was with the State); *Jackson*, 2020 IL 124112, ¶¶ 85-86 (State's mischaracterization of evidence in two comments did not prejudice defendant where the comments were isolated among correct references to the evidence). Importantly, the State also argued to the jury that "defendant has

- 23 -

absolutely no burden to prove anything or disprove anything." The State set forth the propositions it was required to prove as to each of the allegations against defendant. In discussing the propositions, it repeated that the "State has already proven" the first proposition, that the "State has proven" the second proposition, and that the "State must prove" the elements of the offenses. In rebuttal, immediately before the first challenged comment, the State said, "The defendant has absolutely no burden to prove anything or disprove anything." The State's comments were emphasized when the trial court instructed the jury. The court directed that closing arguments were not evidence, that defendant was presumed innocent, that it was the State's burden to prove the allegations beyond a reasonable doubt, that the burden remained with the State throughout the case, and that defendant did not have to disprove any allegations. The trial court repeated that the State had the burden of proof as to each of the allegations.

¶ 58　　　　We find any prejudice that could have occurred as a result of the single improper comment was cured by the State's other comments and the trial court's instructions to the jury, which specified the State had the burden of proof and spelled out the elements the State was required to establish to sustain a first degree murder conviction. *Mudd*, 2022 IL 126830, ¶ 42 (parties' arguments and jury instructions "offset any potential juror confusion about which party bore the burden of proof"); *People v. Flores*, 128 Ill. 2d 66, 95 (1989) (trial court's instruction to the jury regarding the State's burden of proof cured any remarks that could have given the jury an improper impression).

¶ 59　　　　Lastly, it is unlikely defendant would have been acquitted had the State not made the improper comment. *People v. Nieves*, 193 Ill. 2d 513, 534 (2000) (finding evidence of defendant's guilt was "substantial enough that the jury would have returned a verdict of guilty" even without the State's improper argument). Defendant was identified by several eyewitnesses as the shooter, he was arrested after fleeing the scene and changing his shirt, a gun similar to the one identified as used in the shooting was found in the vehicle from which he fled, and he admitted he was in the Press Box wearing a red and white shirt the night of the shooting. The strength of the evidence against defendant precludes the possibility the jury would have found him not guilty if not for the State's isolated improper remark. The State's improper comment did not engender substantial prejudice such that it is

impossible to say if the guilty verdicts resulted from it. We thus conclude that the State's first comment, although improper, does not constitute reversible error.

¶ 60    We next examine the second comment at issue. Unlike the first challenged comment, defendant failed to object to it during closing argument. He did, however, raise the claim in his posttrial motion. Nevertheless, to preserve an issue for appeal, a defendant must both object at trial and raise the issue in a posttrial motion. *Williams*, 2022 IL 126918, ¶ 48. Failure to satisfy both requirements results in forfeiture of the issue on appeal. *Id.* Unpreserved errors, however, may be reviewed under the plain error doctrine when the evidence is so closely balanced that the error tipped the scales against the defendant regardless of the seriousness of the error or when the error is so serious it affected the fairness of the defendant's trial and challenged the integrity of the judicial system, regardless of the closeness of the evidence. *Jackson*, 2020 IL 124112, ¶ 81. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *Id.*

¶ 61    We find the State's second comment does not constitute a clear or obvious error. The State argued to the jury that "the only way this is [a] whodunit" is if it ignored the evidence and found all the State's witnesses were liars. In *People v. Coleman*, 158 Ill. 2d 319, 346 (1994), we differentiated comments where the State argued that, to believe defendant's version of events, the jury would have to believe the State's witnesses were lying and where the State argued that, to acquit the defendant, the jury would have to believe the State's witnesses were lying. We found the first comment is permissible, while the second is not. *Id.* at 346-47. The concern with the second comment is that it impermissibly shifts the burden of proof to the defendant. *Id.* at 346. Here, the State did not inform the jury that to acquit defendant it had to believe all its witnesses were lying. Instead, the State's second comment in the instant case mirrors the first comment in *Coleman*. We thus conclude that the State's second comment does not constitute a clear or obvious error.

¶ 62    In coming to this conclusion, we note that the appellate court curiously chose to review only two of the several closing argument comments that defendant alleged were improper on direct appeal. Accordingly, we must remand this case to the appellate court for it to consider only those issues that were not addressed in its decision appealed to this court. *People v. Lantz*, 186 Ill. 2d 243, 262 (1999)

("appropriate procedure generally is to remand the matter to the appellate court so that previously unaddressed issues may be considered there first").

¶ 63                                                    CONCLUSION

¶ 64        We find that (1) the trial court's exclusion of defendant's mother from the courtroom did not implicate his public trial right, which was not violated as the courtroom was never closed to the public, (2) the identifications resulting from the second lineup were not suggestive where defendant was wearing his own red and white shirt, which he admitted he wore at the Press Box the night of the shooting, (3) the testimony of the gunshot residue expert conflicted with the conclusions she reached in her pretrial report that the gunshot residue analysis showed defendant may not have discharged a firearm and constituted a discovery violation but was not reversible error, (4) the record does not establish the trial court abused its discretion in permitting the jury to view the admitted photograph of defendant in the bar the night of the shooting, and (5) the first complained-of comment in closing argument does not constitute reversible error and the second challenged comment does not constitute clear or obvious error.

¶ 65        Accordingly, we reverse the judgment of the appellate court, affirm the judgment of the trial court, and remand for the appellate court to consider any remaining unresolved issues contained within the briefs filed in the appellate court.

¶ 66        Appellate court judgment reversed.

¶ 67        Circuit court judgment affirmed.

¶ 68        Cause remanded with directions.