2026 IL App (1st) 231223-U

No. 1-23-1223

Order filed May 28, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 14512 |
| | ) | |
| SANTOS CALAFF, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE LYLE delivered the judgment of the court.
Justices Ocasio and Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's convictions for first degree murder and attempted first degree murder over his contentions that (1) he was denied due process when the trial court failed to suppress show-up identifications and (2) he was denied effective assistance when trial counsel failed to file a motion to suppress in-person lineup identifications.

¶ 2    Following a bench trial, defendant Santos Calaff was found guilty of one count of first degree murder and two counts of attempted murder, then sentenced to a total of 60 years in prison. On appeal, he contends that (1) he was denied due process when the trial court failed to suppress

certain show-up identifications, and (2) he was denied effective assistance where trial counsel failed to file a motion to suppress certain in-person lineup identifications. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. 2012 Jury Trial

¶ 5                              1. *Pretrial Motion to Suppress*

¶ 6     Mr. Calaff was charged with multiple offenses stemming from a July 17, 2010, incident during which Emanuel Leeks was fatally shot. On July 22, 2011, Mr. Calaff filed a pretrial motion to suppress. In the motion, Mr. Calaff alleged that multiple witnesses viewed him simultaneously during a show-up, rendering the procedure improperly suggestive. On September 15, 2011, the trial court held a hearing on the motion.

¶ 7     Chicago police officer Steven Rivera testified that, on the night of July 17, 2010, he and his partner heard a radio call regarding "shots fired" which included a description of a Hispanic man wearing a blue shirt and white shorts. The officers relocated to the area of the shooting within a "minute or two" and observed a vehicle on a curb. The vehicle had two occupants, a man with a gunshot wound to the stomach and a woman with a graze wound to the leg. A second woman was near the vehicle. Officer Rivera believed that these women were Ashley Stewart and Stephanie Campbell.[1] Officer Rivera then related a description of the shooter as a Hispanic man with long hair wearing a blue shirt. At the hearing, Officer Rivera did not recall whether both women related the description or just one woman, as his "main concern" was getting the description "out." Officer

---

[1]Although Officer Rivera did not identify the man with the gunshot wound, based upon context, we assume it was Mr. Leeks.

Rivera asserted that "at some point," he spoke to both women. A second description of the shooter was later given to Officer Rivera's partner. Neither description mentioned tattoos.

¶ 8 Later, other officers brought a suspect to the area in the back of a police vehicle. Officer Rivera took one of the women to those officers, who were located down the block. Before the handcuffed suspect was fully removed from the vehicle, the woman said, "that's him." Officer Rivera identified Mr. Calaff in court as the suspect. During this interaction, the second woman remained approximately a quarter block away. The first woman was "led back" toward the crime scene and the second woman was brought to the police vehicle. At this point, Mr. Calaff was outside the vehicle. The second woman also identified Mr. Calaff as the shooter.

¶ 9 During cross-examination, Officer Rivera testified that an initial description of the suspect was given by a 911 caller. Officer Rivera did not detail that description. Officer Rivera and his partner each related a description of the suspect via flash message; he did not detail those descriptions except to say that one of the descriptions mentioned that the offender had a ponytail. Officer Rivera could not "say for sure" whether his partner related that the offender was wearing shorts, but his partner did relate that the offender was heavyset. Mr. Calaff was brought to the crime scene for the show-up 8 to 10 minutes after Officer Rivera arrived.

¶ 10 Chicago police officer Michael Tews testified that he heard Officer Rivera's description of the suspect as a Hispanic man with long hair wearing a blue T-shirt. A few minutes later, Officer Rivera's partner's description of the suspect as a heavyset Hispanic man with a ponytail, wearing a blue T-shirt, was relayed over the radio. Officer Tews also believed that a dispatcher described the suspect as a male Hispanic with a blue T-shirt and white gym shoes. After touring the area in a police vehicle for approximately 10 minutes with his partner, Chicago police officer George

Moussa, Officer Tews observed a person fitting the description. This person, whom Officer Tews identified in court as Mr. Calaff, had long black hair and was wearing a blue T-shirt.

¶ 11 Mr. Calaff looked in the officers' direction, jogged into a courtyard, and entered an apartment building. The officers caught up to Mr. Calaff, who had a "nervous demeanor" and was sweating and "out of breath." A woman who was present stated that she was not with "him." Mr. Calaff was handcuffed. Officer Tews radioed that he apprehended a person "fitting the description of the person wanted for the shooting" and asked that the witnesses be brought to his location. No one was available to transport the witnesses, so Officer Tews relocated Mr. Calaff to the crime scene and stopped about a quarter block away. The witnesses were brought "one at a time." Officer Tews had Mr. Calaff exit the vehicle, and both witnesses identified Mr. Calaff as the shooter.

¶ 12 During cross-examination, Officer Tews testified that he first observed Mr. Calaff approximately two and half blocks from the scene of the shooting and that the witnesses viewed Mr. Calaff separately.

¶ 13 Officer Moussa testified that the first description of the offender was of a person with long hair and a blue shirt, and that the second description was of a heavyset person with long hair and a blue shirt. While at a stop sign, Officer Moussa saw a person whom he identified in court as Mr. Calaff. Officers Moussa and Tews exited their marked police vehicle, followed Mr. Calaff into an apartment building, and took him into custody. Mr. Calaff was out of breath, "profusely" sweating, and his heart was "racing a million miles an hour." Officer Moussa described Mr. Calaff as a heavyset Hispanic man with long hair in a ponytail, who was wearing a blue shirt. Mr. Calaff had tattoos, but Officer Moussa did not recall whether the flash messages referenced tattoos. Mr. Calaff was detained 2½ to 3 blocks from the scene of the shooting.

¶ 14    The officers drove Mr. Calaff to a location one quarter to one half block from where the vehicle containing Mr. Leeks had crashed. There, Officer Rivera "passed" a witness to Officer Moussa, and he brought her to his police vehicle. As Mr. Calaff was exiting the police vehicle, the witness identified Mr. Calaff as the shooter. Officer Moussa then "gave" the witness back to Officer Rivera, who walked away and returned with a second witness. The second witness also identified Mr. Calaff as the shooter. Officer Moussa denied that the two witnesses had the chance to speak to each other as they approached his police vehicle.

¶ 15    The trial court denied the motion to suppress, noting that Mr. Calaff was taken into custody 10 minutes after the shooting, two and a half blocks from the scene, fit the description of an individual with long hair and wearing a blue shirt, and was sweaty and had a rapid heartrate. Although Mr. Calaff was the only person in the vehicle at the time of the show-ups, he was viewed in an "impartial manner."

¶ 16                                    2. *Verdict and Direct Appeal*

¶ 17    The matter proceeded to a jury trial, where Mr. Calaff was found guilty of one count of first degree murder, two counts of attempted first degree murder, and one count of aggravated discharge of a firearm. At trial, in addition to Ms. Stewart and Ms. Campbell, three witnesses testified that they observed the shooting and positively identified Mr. Calaff at the show-up. The court denied Mr. Calaff's motion to admit expert testimony on memory and eyewitness identification. The trial court imposed natural life in prison for first degree murder, concurrent to 40-year prison terms for the two counts of attempted first degree murder, and a 15-year term for aggravated discharge of a firearm.

¶ 18 On direct appeal, we affirmed the trial court's denial of the motion to suppress and the motion to admit expert testimony, and the jury's verdicts as to first degree murder and attempted first degree murder, but vacated the aggravated discharge of a firearm conviction pursuant to the one-act, one-crime rule. We remanded for a new sentencing hearing and mittimus correction. See *People v. Calaff*, 2015 IL App (1st) 130344-U.

¶ 19 On March 30, 2016, our supreme court entered a supervisory order directing us to vacate our order and to reconsider the case in light of *People v. Lerma*, 2016 IL 118496. See *People v. Calaff*, No. 119296 (Ill. Mar. 30, 2016) (supervisory order).

¶ 20 On July 25, 2016, we again affirmed the trial court's denial of defendant's motion to suppress. See *People v. Calaff*, 2016 IL App (1st) 130344-UB, ¶¶ 42-50. We noted that Mr. Calaff argued that, although officers testified at the suppression hearing that Ms. Campbell and Ms. Stewart were separately brought to a police vehicle for a show-up, testimony at trial indicated that all the witnesses viewed Mr. Calaff at the same time. *Id.* ¶ 42. We explained, however, that because the trial court was not asked to reconsider its ruling on the motion to suppress in light of the evidence adduced at trial, Mr. Calaff waived his right to make such an argument on appeal. *Id.* ¶¶ 43-45. We then considered whether the evidence at the hearing on the motion to suppress demonstrated that the show-up was overly suggestive and determined that it was not. *Id.* ¶¶ 46-49. Therefore, we concluded that the trial court's denial of the motion to suppress the identification evidence as unnecessarily suggestive was not manifestly erroneous, and affirmed. *Id.* ¶¶ 50, 61.

¶ 21 We determined, however, that the trial court abused its discretion when it barred Mr. Calaff's introduction of expert testimony on memory and identification. See *id.* ¶¶ 52-58. We

therefore reversed the trial court's order excluding the expert testimony and remanded for a new trial with directions to permit expert testimony on eyewitness identification. See *id.* ¶¶ 59.

¶ 22                                    B. Remand

¶ 23                        1. *Supplemental Motion to Suppress*

¶ 24    On January 22, 2020, Mr. Calaff filed a supplemental motion to suppress identification, alleging that five witnesses viewed him simultaneously while he was in a police vehicle, which was "unnecessarily conducive to mistaken identification." The motion argued that the "truly prejudicial nature" of the show-up did not "come to light" until his trial, when witnesses "volunteered" that they were together while making the identifications.

¶ 25    On February 20, 2020, the trial court held a hearing on the supplemental motion, characterizing it as a "motion to reopen litigation regarding identification testimony." Defense counsel argued that evidence adduced during the first trial differed from the police officers' testimony at the suppression hearing. Counsel noted that rather than two female witnesses individually viewing the show-up as described by the officers at the suppression hearing, five witnesses testified at trial that they were within earshot of each other when they described the suspect to police, participated in the same show-up procedure, and made their identifications of Mr. Calaff at the "same time." Counsel further argued that during the suppression hearing, officers did not mention the three male witnesses. Counsel acknowledged that she failed to renew her motion to suppress during the first trial, such that neither the original trial court nor the appellate court reexamined the motion to suppress in light of the trial evidence.

¶ 26    In response, the State argued that no new information warranted reopening the motion to suppress. The State asserted, without elaboration, that defense counsel interviewed two witnesses

prior to "doing the motion" and Mr. Calaff was present during the show-up and knew of its circumstances. Defense counsel responded that, during the show-up, the officers shone a light in Mr. Calaff's face, and he had "no idea" who was there. She further stated that, when she spoke with the two female witnesses, they did not mention the male witnesses; rather, that information "came out [at] the trial." Counsel further stated that the three male witnesses "never would speak" to her and that she "was never able to get to them." Counsel concluded that the police officers' "disingenuous testimony" led to "gaps in the evidence."

¶ 27    The trial court stated that the appellate court was "very specific" in its remand, which was "limited" to the *Lerma* issue and an expert on eyewitness identification. According to the trial court, the defense was attempting to "essentially, relitigate the motion to suppress identification testimony." The trial court noted that the appellate court was "aware" of the issue, and "upheld***" the "motion to suppress ID and what happened from it." Consequently, the trial court denied the supplemental motion to "relitigate" the motion to suppress identification. The trial court noted, however, that the officers were "under oath now" and could be impeached.

¶ 28    Prior to the second trial, the trial court granted the State's motion to find Chicago police detective Sheamus Fergus, who was deceased, to be a material, unavailable witness and allowed the admission of the transcript of his testimony at Mr. Calaff's first trial. The trial court also granted, over the defense's objection, the State's motion to find Ms. Campbell to be a material, unavailable witness and allowed the admission of the transcript of her testimony at Mr. Calaff's first trial. The court noted that "numerous repeated efforts" to locate Ms. Campbell were unsuccessful and that it was "clear" that she did "not wish to be found."

¶ 29                                        2. *Bench Trial*

¶ 30 On June 21, 2022, Mr. Calaff's bench trial commenced. The State proceeded on two counts of first degree murder, two counts of attempted first degree murder, and one count of aggravated discharge of a firearm.

¶ 31 Ronnie Jordan, who acknowledged prior convictions for firearm possession and narcotics and a pending charge for armed habitual criminal, testified that on the evening of July 16, 2010, he was in a vehicle with Joseph Miller and Rakim Clay. At one point, they met Mr. Leeks, Ms. Campbell, and Ms. Stewart at a gas station and made plans to meet at Mr. Leeks' home. Mr. Leeks then drove away, with Ms. Campbell in the front passenger seat and Ms. Stewart in the back passenger seat.

¶ 32 Shortly after midnight, Mr. Jordan parked across the street from Mr. Leeks' home. Five to ten minutes later, Mr. Leeks arrived and parked approximately 20 feet away. Then a man, whom Mr. Jordan identified in court as Mr. Calaff, appeared. A woman was behind Mr. Calaff on the sidewalk. Mr. Calaff was heavyset and wore a "bright" blue shirt, which caught Mr. Jordan's attention. Mr. Calaff approached the front passenger side of Mr. Leeks' vehicle, yelled, and tapped on the window with a silver firearm. The occupants raised their hands. As Mr. Leeks' vehicle began to reverse, Mr. Calaff fired into it. After four or five shots, Mr. Calaff shot at Mr. Jordan's vehicle. Mr. Jordan ducked down and drove away. He then returned to Mr. Leeks' vehicle, searched to see where Mr. Leeks "was shot at," and tried to put pressure on the wound.

¶ 33 After five to ten minutes, a detective arrived and called for an ambulance. As Mr. Leeks was removed from the vehicle, a squad car arrived and detectives "asked us" if "we" could identify a "person of interest." Mr. Jordan testified that Mr. Calaff was the person whom Mr. Jordan saw

shooting. Mr. Jordan viewed a lineup at a police station "maybe the day after" and identified Mr. Calaff as the shooter.

¶ 34    During cross-examination, Mr. Jordan testified that, at some point, he and four other witnesses described the shooter to the police. Ms. Campbell and Ms. Stewart gave "police dispatch" an initial description and when officers arrived, the "same description" was given. Mr. Jordan agreed that he, Ms. Campbell, Ms. Stewart, Mr. Clay, and Mr. Miller described the shooter at "pretty much at the same time." The group told the police that the shooter had tattoos, specifically, "horns above his eyes" and "looked like the devil." Mr. Jordan did not recall stating, in a prior proceeding, that he did not tell the police that he saw tattoos. All five witnesses were together when the person they identified was removed from a police vehicle. Mr. Jordan was about 30 feet away and was unsure whether the police had the shooter in custody until Mr. Calaff was removed from the vehicle. He later recognized Mr. Calaff in a lineup because he had seen him discharge a firearm.

¶ 35    Mr. Miller testified that he was in a vehicle with Mr. Clay and Mr. Jordan when Mr. Leeks parked across the street, directly under a streetlight. Then, "[o]ut of nowhere," a "husky" man with a blue shirt and white shorts walked up to Mr. Leeks' vehicle, screaming. This man, whom Mr. Miller identified in court as Mr. Calaff, drew a firearm, which he tapped on one of the vehicle's windows. As Mr. Leeks reversed the vehicle, Mr. Calaff fired into the passenger side. Mr. Miller estimated that he was 5 to 10 feet away when Mr. Calaff began shooting into Mr. Leeks' vehicle, which was parked "directly" under a streetlight. Mr. Miller yelled, "hey what are you doing," and Mr. Calaff turned and fired at the vehicle containing Mr. Jordan, Mr. Miller, and Mr. Clay. Mr. Jordan drove around the block. Mr. Miller saw Mr. Leeks' vehicle "crash" into a tree.

¶ 36    Mr. Miller further testified that, at this point, events became a "little foggy." Ms. Campbell contacted police, who arrived 10 to 15 minutes later. According to Mr. Miller, "[w]e" were "quite a distance away" when a handcuffed person was removed from a vehicle. The police asked whether this was "the person who we seen shoot at the car," and "[w]e all agreed yes." Mr. Miller testified that this was the same person whom he identified in court and whom he saw shoot at Mr. Leeks. On July 18, 2010, Mr. Miller went to a police station, viewed a lineup, and identified Mr. Calaff as the shooter.

¶ 37    During cross-examination, Mr. Miller testified that the group stood together, but spoke with officers separately. The officers pulled Mr. Miller away from the group and spoke with him individually. Although Mr. Miller gave a description of the shooter to officers, at trial he did not remember whether he indicated that the shooter had tattoos. Mr. Miller could not estimate his distance from the vehicle containing Mr. Calaff during the show-up. He did not think that the officers told the group that "they had a person of interest." Rather, the officers removed someone from the police vehicle and asked if that person was the shooter. At this point, Mr. Miller was standing with Ms. Campbell, Ms. Stewart, Mr. Clay, and Mr. Jordan, who "all said, yes."

¶ 38    Mary Turner testified that she was 32 years old at the time of trial and acknowledged having a prior "drug" conviction and a pending contempt proceeding related to this case. Around 12:45 a.m. on July 17, 2010, Ms. Turner was on her porch when a vehicle occupied by Mr. Leeks parked by a light pole. She also saw a man, whom she identified in court as Mr. Calaff, and a woman standing in a gangway across the street. Earlier, when it was "still light outside," Mr. Calaff had walked past Ms. Turner's home, sat on the porch, and chatted with her and her sister.

¶ 39    The woman handed something to Mr. Calaff, who approached Mr. Leeks' vehicle. Mr. Calaff knocked on a window and started firing into the vehicle. The driver of the vehicle tried to reverse and then "took off" toward a park. Initially, Ms. Turner did not speak to the police because she was scared. On July 18, 2010, officers came to her home and took her to a police station. There, she viewed a lineup and identified Mr. Calaff as the man on her porch and the shooter.

¶ 40    During cross-examination, Ms. Turner testified that she previously had issues with drugs. On July 16, 2010, she saw Mr. Calaff, who wore a white shirt and blue jeans, at a park while her children played. She had also seen Mr. Calaff when she was seven years old and "[e]verybody was hanging on the block."

¶ 41    Officer Rivera testified that around 12:45 a.m. on July 17, 2010, he and his partner responded to a call of person shot and observed a vehicle that had crashed into a tree. The driver, later determined to be Mr. Leeks, had been shot. There were also two women, one inside the vehicle and one outside it. Officer Rivera did not recall any other individuals being present. He immediately spoke to the women and put a "quick description" of the offender "over the air." One of the women, Ms. Campbell, described the offender as a Hispanic man with long hair wearing a blue shirt. Within a minute, Officers Tews and Moussa arrived and then left. At one point, Officers Tews and Moussa returned with Mr. Calaff, whom Officer Rivera identified in court, in their vehicle.

¶ 42    Officer Moussa testified that around midnight or 12:30 a.m. on July 17, 2010, he and Officer Tews responded to a call of a person who had been shot. As they drove to the location, they heard a flash message describing the shooter as a heavyset Hispanic man with long black hair wearing a blue shirt. They looked for the suspect and, two to three minutes after hearing the flash

message, observed a heavyset man with long black hair wearing white shorts and a blue shirt standing in front of an apartment building. This location was two to three blocks from the scene of the shooting. The individual, whom Officer Moussa identified in court as Mr. Calaff, jogged into the building. The officers followed him inside. Mr. Calaff was "soaked from head to toe" with sweat, his chest was "beating through his shirt," and his carotid artery was pulsating. A Hispanic woman was also present in the vestibule. The officers placed Mr. Calaff in the back of their patrol vehicle and requested that other officers bring the witnesses to the building, but no officers were available.

¶ 43 Officers Moussa and Tews then transported Mr. Calaff to the witnesses' location. There, Officer Moussa exited the vehicle and approached Officer Rivera, who "grabbed" a female witness. They walked back to Officer Moussa's vehicle. Officer Tews removed Mr. Calaff from the vehicle and the witness identified him as the shooter. Officer Tews returned Mr. Calaff to the vehicle and Officer Moussa "walked back" with Officer Rivera. Officer Rivera then brought a second female witness. Officer Tews removed Mr. Calaff from the vehicle and a second identification occurred. Officers Moussa and Tews were then instructed to take Mr. Calaff to a police station. Officer Moussa did not speak to any witnesses.

¶ 44 During cross-examination, Officer Moussa acknowledged that it was hot that night. Mr. Calaff was taken into custody three to four minutes after the shooting and no firearm was recovered. When Officers Moussa and Tews brought Mr. Calaff to the area where the victim's vehicle had crashed, they parked 40 to 45 feet away. Officer Moussa believed that Officer Rivera and a witness were already walking toward him as he approached them. Mr. Calaff, who was handcuffed, was removed from the vehicle, the first identification occurred, and then the witness

was walked back to the "group." Officer Rivera grabbed the second woman and same procedure was followed. Officer Moussa did not know if "there was a group," but "it was maybe the detectives." Then, he agreed that the group was "whomever else was on scene." Officer Moussa did not recall whether male witnesses were present and acknowledged that his memory of that night was "mostly" from a review of documents. Officer Moussa's "only true recollection" was that Mr. Calaff was "profusely" sweating, with his heart beating through his chest and his carotid artery pulsating.

¶ 45    The State then submitted into evidence a redacted copy of Ms. Campbell's testimony from Mr. Calaff's first trial. Ms. Campbell testified that she was in the front passenger seat and Ms. Stewart was in the back seat when Mr. Leeks parked the vehicle. As Ms. Campbell gathered her purse, she saw a man, whom she identified in court as Mr. Calaff, and a Hispanic woman emerge from the side of a house. As Mr. Calaff approached, he drew a firearm, which he tapped on Ms. Campbell's window. Mr. Calaff said, "f*** y'all doing over here." About 10 seconds later, Mr. Leeks put the vehicle in reverse and Mr. Calaff fired. Mr. Calaff also turned and shot at Mr. Jordan's vehicle. Mr. Leeks stated that he was "hit" and felt light-headed. Then, Mr. Leeks lost consciousness and the vehicle hit a tree. A second Hispanic man approached, asked if "he" was hit, looked inside the vehicle, did a "hand motion," and ran away.

¶ 46    Ms. Campbell called 911 and described what happened. Five minutes later, she spoke to detectives. Ms. Campbell described the shooter as a tall, heavyset Hispanic man with a ponytail, wearing a blue shirt over a white shirt, white shorts, and white tennis shoes. He had facial tattoos, "[d]evil horns *** above each eyebrow," and "teardrops" on the right side of the face. After another five minutes, an ambulance arrived. Five minutes after that, officers returned and stated

that someone was in custody. A police vehicle parked about a half-block from Ms. Campbell. A person exited the police vehicle and Ms. Campbell said, "yes that's him." According to Ms. Campbell, this was the same person she identified in court.

¶ 47    During cross-examination, Ms. Campbell denied seeing Mr. Calaff many times before "hanging out in front of the same house that he came out of." She acknowledged providing a statement to a detective and an assistant State's Attorney (ASA) on July 17, 2010, that the ASA typed the statement and read it to her, and that she was permitted to make changes. Although this statement indicated that Ms. Campbell had seen the shooter many times, at trial, she denied saying "that" and stated that she identified this mistake every time she was shown the statement.

¶ 48    At the time of the shooting, people were outside on porches. Ms. Campbell observed Mr. Calaff exit a gangway and approach the vehicle, holding a black and chrome handgun. She did not mention that Mr. Calaff had tattoos until the first officer to arrive requested a detailed description of the shooter. She told this officer that the shooter had a ponytail, facial tattoos, and wore a blue shirt with a white shirt underneath and white shoes. The officer related that description over the radio as Ms. Campbell spoke. When the police vehicle arrived with a person in it, Ms. Campbell walked "a little bit" closer, but not all the way to the vehicle. She was standing near an ambulance with Mr. Jordan, Mr. Miller, Mr. Clay, and Ms. Stewart. They all saw Mr. Calaff at the same time and then he was returned to the vehicle.

¶ 49    The State submitted into evidence the testimony of a forensic scientist from Mr. Calaff's first trial. The parties stipulated to the contents of the forensic scientist's testimony. This testimony provided, in pertinent part, that Mr. Calaff's gunshot residue test showed that he " 'may not have

discharged a firearm with either hand,' " and " '[i]f he did, then the particles were not deposited, removed by activity, or not detected by the procedure.' "

¶ 50    The defense then asked to "reopen" its request for the suppression of evidence, arguing that the show-up was improper and the resulting identifications should be suppressed. The court responded that when it "initially inherited this case there were extensive motions done \*\*\* regarding the issue of identification." However, the court stated that the trial testimony "regarding the show-up" did not change its opinion and denied the defense's request.

¶ 51    The trial court then admitted a transcript of Detective Fergus' testimony from Mr. Calaff's first trial. Detective Fergus testified that, after he was assigned to the investigation, he learned that someone had been taken into custody. Detective Fergus briefly spoke to Ms. Campbell and Ms. Stewart, but did not speak to Mr. Jordan, Mr. Miller, and Mr. Clay until they came to a police station on the afternoon of July 17, 2010. Detective Fergus conducted lineups on the afternoon of July 18, 2010. Ms. Turner, Mr. Miller, Mr. Jordan, and Mr. Clay each viewed a lineup and identified Mr. Calaff as the person who approached Mr. Leeks' vehicle, tapped on the window, and discharged a firearm.

¶ 52    Detective Fergus identified People's Exhibit No. 20, a photograph of the lineup viewed by Mr. Jordan, Mr. Miller, and Mr. Clay. Detective Fergus noted that the participants in the lineup were provided a "do-rag" to "make it as fair" as possible since Mr. Calaff had "a lot of hair." The do-rag also covered the "majority" of the tattoos over Mr. Calaff's eyes. Mr. Calaff also wore a white T-shirt in the lineup as opposed to the blue shirt he wore at the time of his arrest. The other participants also wore white T-shirts.

¶ 53     The lineup photograph is included in the record on appeal. It depicts five men with similar skin tones wearing black do-rags which cover a portion of their foreheads. Mr. Calaff's hair is visible behind his head. All five men are wearing white T-shirts, three men are wearing long pants, and two men, including Mr. Calaff, are wearing shorts. Mr. Calaff is the only participant wearing white shorts. The men's shoes are black, brown, black and blue, white and red (Mr. Calaff), and red with white soles. Mr. Calaff has arm tattoos and another man has a hand tattoo. Four of the men have facial hair which includes hair under the chin.

¶ 54     During cross-examination, Detective Fergus testified that each person viewed the lineup separately. To the best of his knowledge, the three male witnesses who viewed the lineup did not view the show-up.

¶ 55     During redirect examination, Detective Fergus testified that a show-up occurs under different circumstances than a lineup. "[U]sually," show-ups occur close to the time of a crime. Ms. Campbell and Ms. Stewart did not view lineups because they "positively" identified Mr. Calaff to officers at the scene.

¶ 56     During recross, Detective Fergus testified that one person was taken to the crime scene in a marked police vehicle. Detective Fergus believed that the suspect was handcuffed during the show-up. Detective Fergus would not handcuff a single participant in a lineup; rather, everyone in the lineup would be handcuffed. Although it was not "standard" for a witness view a show-up and a lineup, it had happened before.

¶ 57     The State's next exhibit was a stipulation from Mr. Calaff's first trial that a deputy medical examiner, if called, would testify that Mr. Leeks' autopsy revealed that his cause of death was a gunshot wound to the abdomen and that his manner of death was homicide.

¶ 58    Mr. Calaff called Dr. Kim Maclin, an expert in the field of perception and memory. Dr. Maclin reviewed transcripts of the 911 call, the first trial, depositions, police reports, and photographs to identify potential problems with the collection of "memory evidence."

¶ 59    Dr. Maclin explained that memories are a "physiological process" and are stored throughout the brain, and "boil down" to communication between neurons. A memory is retrieved "based on cues," such as questions or information in an environment. A person can persist in the "belief" that a "wrong" memory is accurate. Dr. Maclin opined that it was "very easy to contaminate a memory based on how that memory is cued."

¶ 60    Dr. Maclin further testified that the ability to "judge" the passage of time is "highly variable." The amount of time during which a person experiences an event affects the memory and perception of that event, as does whether the person "was attending to" what occurred. In other words, people "can readily develop a memory of an event even if [they] don't have the accurate sensory perceptional information encoded." Regarding this case, Dr. Maclin testified that there was a short amount of time for the witnesses to "see things," and that "the eyes are bouncing around" to "piece together a visual environment." Additionally, as the event was being experienced, the witnesses did not "know yet" what was important.

¶ 61    According to Dr. Maclin, stress has "differential impacts" on cognitive performance, including memory. High stress, including "being very fearful," reduces the ability for "optimum cognitive and memory performance." Shootings are "typically extremely stressful," and it would be "very difficult to lay down a coherent, accurate memory" in such "high stress circumstances." When a weapon is present, witnesses "tend" to provide detail and information about the weapon because that is where their eyes "go." Consequently, there is "less time" to view the perpetrator.

¶ 62    In this case, Dr. Maclin opined, based upon the "level of detail" the witnesses gave about the firearm, that the witnesses "could not be looking at the [shooter's] face during that time." Further, "weapon focus" could "contribute to faulty identification." Dr. Maclin testified that the ability to see at a distance becomes "compromised" at some point and is "varying." Artificial lighting can also affect the ability to perceive. Dr. Maclin therefore concluded that, in this case, the witnesses' "view" could have been compromised without them remembering it.

¶ 63    Dr. Maclin further testified that a person's eyes are drawn to things that "stand out" or are unique. Distinctive features play an "important role" in memory and identification. Here, Mr. Calaff had tattoos on his face and arms. Dr. Maclin found it "significant" that none of the reports or calls from the day of the shooting mentioned tattoos. Dr. Maclin next explained that unconscious transference occurs when a person has had a previous experience with an individual and that "familiarity" is misinterpreted as memory for a particular event.

¶ 64    According to Dr. Maclin, lineups should be conducted so that a suspect does not "stand out." If a suspect "unduly stands out" and draws a witness's attention, the witness is unable to "distinguish" whether it is an "attention grabbing situation" or a feeling "like I remember that that's the guy." Dr. Maclin testified that memory scientists considered show-ups to be "unduly suggestive." A person who views a show-up can "no longer access the memory of the original event" because the show-up as acts as an "interceding event."

¶ 65    Dr. Maclin opined that, in this case, the witnesses' memories were "contaminated" because they viewed a show-up. The circumstances, including that Mr. Calaff was handcuffed and in a police vehicle, and that he was brought to the crime scene rather than a more "neutral" setting,

meant that the "best memory" evidence was not collected and the procedure could have led to misidentification.

¶ 66    Dr. Maclin testified that circumstances of an identification should be documented, including the time it took for the witness to make the identification, and what the witness said and did. Here, there was no information about the circumstances of each identification. Dr. Maclin concluded that many "procedural shortcomings and errors in the collection of memory evidence" occurred in this case which led to "contamination."

¶ 67    During cross-examination, Dr. Maclin acknowledged that she did not speak to any of the witnesses and that show-ups are legally acceptable. However, she opined that the scientific literature demonstrated that show-ups were unduly suggestive.

¶ 68    The defense entered a stipulation that, at Mr. Calaff's first trial, Mr. Jordan was asked whether he told the police that he had seen tattoos (presumably on the shooter) and answered that he did not.

¶ 69    In finding Mr. Calaff guilty, the trial court observed, relevant here, that the defense argued that the show-up was inherently suggestive and that any subsequent identifications were tainted. However, the court noted that Ms. Campbell called 911 "immediately" after the shooting and described the shooter as a heavyset Hispanic man with a ponytail wearing a blue shirt over a white shirt, white shorts, and white tennis shoes, and that Mr. Jordan specifically testified that Mr. Calaff's "bright" blue shirt caught his attention. Additionally, Ms. Campbell and Mr. Jordan testified consistently that Mr. Calaff was accompanied by a Hispanic woman. Mr. Miller also described the shooter as a husky man with a ponytail wearing a blue shirt and white shorts.

¶ 70    The court then found that Ms. Turner was a "completely" independent witness, who had previously seen and spoken to Mr. Calaff. Ms. Turner observed a woman give something to Mr. Calaff, who approached Mr. Leeks' vehicle and fired into it, which corroborated other testimony that a woman accompanied Mr. Calaff. The court then noted that Ms. Turner did not participate in the show-up; rather, she identified Mr. Calaff in a lineup.

¶ 71    The court concluded that this was a case with four eyewitnesses, one of whom was completely independent from the other three, and that the four witnesses corroborated each other. The court therefore found Mr. Calaff guilty of one count of first degree murder, two counts of attempted first degree murder and one count of aggravated discharge of a firearm. After reviewing this court's prior dispositions, the trial court vacated its guilty finding as to aggravated discharge of a firearm.

¶ 72    Mr. Calaff filed a motion for a new trial, alleging, relevant here, that the trial court erred in denying the defense's motion to reconsider the motion to suppress identification. Following argument, the trial court denied Mr. Calaff a new trial and imposed a 60-year prison term for first degree murder and two concurrent 35-year terms for attempted first degree murder. Mr. Calaff filed a motion to reconsider sentence, which was denied.

¶ 73    Mr. Calaff now appeals. We find that we have jurisdiction to consider the merits of Mr. Calaff's appeal pursuant to Illinois Supreme Court Rule 606 (eff. Jul. 1, 2017).

¶ 74                                    II. ANALYSIS

¶ 75    Mr. Calaff first contends he was denied due process because the trial court failed to suppress the initial identifications of him, which were made in the "highly suggestive" atmosphere of a group show-up. Mr. Calaff asks this court to (1) make a factual determination that the

witnesses were in a group when the initial identification occurred, (2) determine that the group show-up violated his constitutional rights and that the initial identifications were unreliable, and (3) find that the admission of the show-up identifications was not harmless error.

¶ 76 The State responds that the trial court's 2011 ruling on the pretrial motion to suppress was previously affirmed by this court in 2016. According to the State, the judgment that Mr. Calaff now appeals from is the trial court's denial of his January 22, 2020, supplemental motion to suppress identification, which Mr. Calaff made following our remand for a new trial. The State concludes that the trial court did not abuse its discretion when it denied the motion to reopen because Mr. Calaff failed to show that the evidence at issue, *i.e.*, the circumstances of the show-up, was newly discovered.

¶ 77 We note that, although the section of Mr. Calaff's brief titled "ISSUES PRESENTED FOR REVIEW" refers to a "renewed" motion to suppress show-up identifications, his substantive argument is more general; that is, that he was denied due process when the trial court failed to suppress the show-up identifications. Mr. Calaff asks us to review the denial of the motion to suppress on the merits based upon evidence adduced at both trials, noting that the "trial court made no attempt to resolve *** conflicts in the testimony." Based upon this context, we believe that Mr. Calaff seeks review of the trial court's denial, upon remand, of his attempts to reopen litigation on the 2011 motion to suppress identification.

¶ 78 Here, Mr. Calaff presented his motion to reopen the litigation on the motion to suppress following this court's remand for a new trial. "[W]hen a reviewing court issues a mandate, the trial court is vested with jurisdiction to take only such action as conforms to the mandate." See *People v. Luna*, 2025 IL App (2d) 240382, ¶ 26; see also *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271,

276 (1982) ("a trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court"). Accordingly, the initial question before this court is "what our mandate actually considered and decided, because a mandate does not preclude the trial court on remand from taking actions not specified but still in conformance with the mandate." *Luna*, 2025 IL App (2d) 240382, ¶ 28.

¶ 79 Following our initial affirmance of the trial court's denial of the motion to suppress and the jury's guilty findings on first degree murder and attempted murder, our supreme court instructed us to reconsider the outcome in light of *Lerma*, which discussed the admission of expert testimony regarding the reliability of eyewitness testimony. The supervisory order did not instruct us to reconsider our prior affirmance of the trial court's denial of the motion to suppress, and, in our second decision, we again affirmed the trial court's denial of Mr. Calaff's motion to suppress the show-up identifications as unnecessarily suggestive. See *Calaff*, 2016 IL App (1st) 130344-UB, ¶¶ 42-50. In accordance with our supreme court's instruction, we then reviewed the trial court's denial of Mr. Calaff's request to allow expert testimony on the reliability of eyewitness identification in light of *Lerma*, determined that the trial court's order excluding this testimony was an abuse of discretion, and remanded for a new trial with directions to allow expert testimony on eyewitness identification. See *id.* ¶¶ 52-61.

¶ 80 On remand, the trial court noted that our mandate was "very specific" and "limited" to the *Lerma* issue. In denying Mr. Calaff's request to "reopen litigation regarding identification testimony," the trial court noted that the appellate court was "aware" of his challenge to the court's denial of the motion to suppress the show-up identifications, and upheld "the motion to suppress ID and what happened from it."

¶ 81    Here, the trial court comported with this court's mandate when it declined to reconsider the motion to suppress identification and instead focused on the *Lerma* issue because that was the issue on which we remanded the cause. See *People ex rel. Daley*, 92 Ill. 2d at 276 ("a trial court must obey the clear and unambiguous directions in a mandate issued by a reviewing court").

¶ 82    Moreover, because we previously affirmed the trial court's denial of the motion to suppress, the law-of-the-case doctrine applies. Pursuant to the law-of-the-case doctrine, "rulings made on points of law by a reviewing court are binding in the trial court upon remand and on subsequent appeals to the same reviewing court unless a higher court has changed the law." *People v. Anderson*, 2015 IL App (2d) 140444, ¶ 27. As our supreme court explained, when a reviewing court

> " 'announces a particular view of the law governing the case and reverses and remands the case for further proceedings in accordance with the views announced, if the case is again brought before such court for review the former decision is binding on the court making it, and the questions decided and determined by it on the first appeal are not open for re-consideration on the second appeal.' " *Relph v. Board of Education of DePue Unit School District No. 103 of Bureau County*, 84 Ill. 2d 436, 443 (1981) (quoting *Zerulla v. Supreme Lodge Order of Mutual Protection*, 223 Ill. 518, 520 (1906)).

¶ 83    In essence, the law-of-the-case doctrine prevents a defendant from " 'taking two bites out of the same appellate apple.' " *People v. Tenner*, 206 Ill. 2d 381, 395 (2002) (quoting *People v. Partee*, 125 Ill. 2d 24, 37 (1988)). There are two exceptions to the law-of-the-case doctrine: (1) if a higher reviewing court makes a contrary ruling on the same issue after the lower court's decision,

and (2) if a reviewing court determines that its prior decision was palpably erroneous. *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, ¶ 10.

¶ 84    Here, in *Calaff*, 2016 IL App (1st) 130344-UB, we affirmed the trial court's denial of the motion to suppress, explained our reasoning, and provided supporting authority for our conclusion. Mr. Calaff does not argue that our supreme court has changed the law in this area since the disposition of his prior appeal or that our prior determination was palpably erroneous. Rather, he argues that this court can reach the "merits" of the motion to suppress based upon the additional evidence adduced at both trials because, in pertinent part, he filed a supplemental motion to suppress once the case was remanded for a new trial. However, as discussed, in *Calaff*, 2016 IL App (1st) 130344-UB, we affirmed the denial of the motion to suppress, and the scope of our remand was limited to the *Lerma* issue. Mr. Calaff does not address how the limited remand in this case would permit the trial court to revisit an issue that was affirmed on appeal. As a reviewing court, we are entitled to have the issues clearly defined, pertinent authority cited, and a cohesive legal argument presented. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 88.

¶ 85    Mr. Calaff notes that in addressing the motion to suppress in our prior decision on appeal, we did not consider the evidence adduced at his first trial because trial counsel failed to ask the trial court to reconsider its ruling based upon that evidence, and therefore, the issue was waived on appeal. See *Calaff*, 2016 IL App (1st) 130344-UB, ¶¶ 42-50. Mr. Calaff concludes that, even if this claim is not now properly before us, he should not be punished "*if* prior counsel was ineffective" (emphasis in original) for failure to preserve the claim and, therefore, we should reach the merits to "prevent further litigation in postconviction proceedings."

¶ 86    Mr. Calaff, however, has not alleged that he was denied effective assistance by trial counsel's failure to properly preserve this issue during his first trial or by appellate counsel's failure to raise it in his prior appeal, and has therefore forfeited this issue on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Mr. Calaff asks this court to order supplemental briefing on the issue, essentially attempting to raise a new argument after the completion of briefing. Where our rules do not allow an appellant to assert new issues in a reply brief, the appellant should also not be allowed "to file a supplemental brief which seeks to accomplish the same purpose, *i.e.,* to raise an issue not previously considered in his original brief." *People v. Pertz*, 242 Ill. App. 3d 864, 914 (1993).

¶ 87    As noted, Mr. Calaff argues that we should reach the merits of this issue in the interest of judicial economy and to prevent a postconviction proceeding. In support of that proposition, Mr. Calaff relies on *People v. Duffie*, 2021 IL App (1st) 171620. In that case, the defendant filed a motion to suppress alleging that he was arrested and searched without exigent circumstances or consent. *Id*. ¶ 6. Following a hearing, the trial court denied the motion. *Id*. ¶ 10. The defendant was thereafter found guilty of two counts of possession of a controlled substance. *Id.* ¶ 24. Although the defendant challenged the sufficiency of the evidence in a posttrial motion, he did not challenge the denial of the motion to suppress. *Id.* ¶ 26.

¶ 88    On appeal, the defendant contended that officers lacked probable cause to search him. *Id.* ¶ 29. The reviewing court noted that the defendant did not challenge the denial of the motion to suppress in his posttrial motion, which, generally, would result in forfeiture on appeal. *Id.* ¶ 32. The court noted, however, that "[r]eviewing courts will review (1) constitutional issues properly

preserved at trial that may be raised later in a postconviction petition, (2) challenges to the sufficiency of the evidence, and (3) plain errors." *Id.* (citing *People v. McDonald*, 2016 IL 118882, ¶ 45). The defendant did not request plain error review or "review of claims under any other method whereby [a reviewing court] can consider a forfeited claim." *Id.* ¶ 33. The court therefore relied on *People v. Cregan*, 2014 IL 113600, which held that the constitutional-issue exception applies when a defendant's motion to suppress asserts a violation of his constitutional right to be free from unreasonable searches and seizures, to reach the defendant's contention on appeal rather than requiring him to raise it in postconviction proceeding. *Duffie*, 2021 IL App (1st) 171620, ¶¶ 34-35.

¶ 89    Unlike *Duffie*, in the case at bar, this court already affirmed the denial of the motion to suppress prior to remand. Moreover, other than arguing in favor of judicial economy, Mr. Calaff does not identify a case with a similar procedural posture applying the constitutional-issue exception. This court is not a depository in which a party may dump the burden of argument and research. See *Macias*, 2015 IL App (1st) 132039, ¶ 88.

¶ 90    Here, in our disposition of Mr. Calaff's prior direct appeal, we affirmed the trial court's denial of the motion to suppress and remanded for a new trial with the inclusion of expert testimony on memory. Accordingly, the trial court comported with our mandate when it declined to reopen litigation on the motion to suppress. See *Luna*, 2025 IL App (2d) 240382, ¶ 26.

¶ 91    Mr. Calaff next contends that he was denied the effective assistance of counsel when trial counsel failed to file a motion to suppress the lineup identifications. He argues that the lineups were (1) overly suggestive because he was the only participant who was heavyset with long hair

wearing white shorts and white shoes and (2) tainted by the involvement of witnesses who had viewed the prior show-ups.

¶ 92 To succeed on a claim of ineffective assistance, a defendant must show that counsel's performance was deficient, and that this deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). A defendant's failure to establish either prong of the *Strickland* test is fatal to his ineffective assistance claim. *People v. Webb*, 2023 IL 128957, ¶ 21.

¶ 93 Counsel's decision whether to file a motion to suppress is generally a matter of trial strategy and entitled to great deference. *Id.* ¶ 23. To establish prejudice when an ineffective assistance claim is based on the failure to file a suppression motion, a defendant must demonstrate that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed. *People v. Henderson*, 2013 IL 114040, ¶ 15. We review whether a defendant was denied the effective assistance of counsel *de novo*. *Webb*, 2023 IL 128957, ¶ 23.

¶ 94 A pretrial identification is excluded " 'only if the identification procedure was unnecessarily suggestive leading to a substantial likelihood of misidentification.' " *People v. Smith*, 2025 IL 130067, ¶ 37 (quoting *People v. Faber*, 2012 IL App (1st) 093273, ¶ 55). A defendant has the burden to establish that the identification procedure was suggestive. *Id.* If the defendant makes that showing, the burden shifts to the State to overcome the defendant's showing by "clear and convincing evidence that the witness is identifying the defendant based on his or her independent recollection of the incident." *People v. Brooks*, 187 Ill. 2d 91, 126 (1999). A reviewing court assesses the totality of the circumstances when reviewing a claim of an unnecessarily suggestive identification. *People v Joiner*, 2018 IL App (1st) 150343, ¶ 39.

¶ 95    "Individuals selected for a photo array lineup need not be physically identical." *People v. Allen*, 376 Ill. App. 3d 511, 521 (2007). While there is no requirement that lineup participants be nearly identical or " 'look alikes of the witnesses' descriptions,' if the defendant is the only one in the lineup required to wear the clothing that the suspect reportedly wore the lineup may be unduly suggestive." *People v. Clifton*, 2019 IL App (1st) 151967, ¶ 63 (quoting *People v. Johnson*, 149 Ill. 2d 118, 147 (1992)).

¶ 96    At Mr. Calaff's first trial, Detective Fergus identified a photograph of the lineup viewed by Mr. Jordan, Mr. Miller, and Mr. Clay. This photograph is included in the record on appeal and depicts five men. All the participants in the lineup were of a similar age and skin tone, and are posed in a similar manner. Additionally, all participants wore do-rags and white T-shirts. We note that, although testimony indicated that Mr. Calaff had facial tattoos, based upon the position of the do-rag on Mr. Calaff, no facial tattoos are visible. While the lineup participants were neither physically identical nor wearing the same outfit, there is no such requirement. See *Allen*, 376 Ill. App. 3d at 521 (lineup participants need not be physically identical). Moreover, no one in the lineup wore the blue T-shirt described by several witnesses. See *Clifton*, 2019 IL App (1st) 151967, ¶ 63 (lineup may be unduly suggestive when the defendant is the only person in the lineup wearing the same outfit that the suspect reportedly wore).

¶ 97    To the extent that Mr. Calaff contends that his hair stood out, all participants in the lineup wore do-rags covering the majority or all of their hair. Differences in hair style do not necessarily render the lineup impermissibly suggestive. See *People v. Kelley*, 304 Ill. App. 3d 628, 636-38 (1999) (lineups were not unduly suggestive where the defendant was the only individual with an Afro hairstyle in one lineup and French braids in another); see also *People v. Johnson*, 104 Ill.

App. 3d 572, 578-79 (1982) (the defendant failed to meet his burden to establish the lineup was suggestive when he was the only bald and bearded participant). While Mr. Calaff was the largest person in the lineup, differences in size and appearance of lineup participants "go to the identification's weight and not necessarily its admissibility." *Smith*, 2025 IL 130067, ¶ 38; see also *People v. Harrison*, 57 Ill. App. 3d 9, 10, 13 (1978) (rejecting the defendant's argument that the pretrial identification procedure was suggestive where the victim described the offender as being " 'very tall' " and the defendant was the tallest person in lineup).

¶ 98    Finally, Mr. Calaff notes that only he and one other participant wore shorts, and that he was the only participant in white shorts and shoes. The fact that Mr. Calaff was the only person wearing white shorts and shoes, which several witnesses described the shooter as wearing, is not sufficient to render the lineup suggestive. See *Faber*, 2012 IL App (1st) 093273, ¶ 57 (the fact that the defendant was the only person wearing a sleeveless T-shirt, which a witness had indicated that the offender wore, was insufficient to render the lineup suggestive); see also *People v. Johnson*, 222 Ill. App. 3d 1, 8-9 (1991) (lineup was not suggestive even though the defendant was the only participant wearing red pants when witnesses described the offender as wearing red pants). Here, it appears that Mr. Calaff wore his own shorts and shoes, but that the police changed the blue T-shirt he wore at the time of his arrest for a white T-shirt and used a do-rag to cover Mr. Calaff's hair and facial tattoos. Mr. Calaff, therefore, has not persuaded us that there was "improper influence here where [he] simply wore his own clothing in the lineup." See *People v. Gabriel*, 398 Ill. App. 3d 332, 349 (2010).

¶ 99 Mr. Calaff further argues that the lineup was tainted because three witnesses viewed both the show-up and the lineup. He also challenges Ms. Turner's identification, largely based upon evidence adduced at the first trial.

¶ 100 To the extent that Mr. Calaff rests his arguments on testimony adduced at his first trial, that evidence is not now before this court. As discussed, we remanded for a new trial, and Mr. Calaff now appeals from the convictions resulting from that second trial. Accordingly, we consider his arguments in light of the evidence adduced at his second trial.

¶ 101 Here, Mr. Jordan and Mr. Miller testified that they viewed the show-up and lineups. Ms. Turner, however, solely viewed the lineup. Accordingly, even if this court were to agree that Mr. Jordan and Mr. Miller's lineup identifications were somehow tainted by their previous identifications of Mr. Calaff at the show-up, Ms. Turner's identification was not. That is, Ms. Turner was an independent witness, who was not present at the show-up.

¶ 102 Mr. Calaff further challenges Ms. Turner's identification because she did not provide a "consistent description" of the offender. In his opening brief, he relies on Ms. Turner's testimony at his first trial during which, according to Mr. Calaff, she testified that the "gunman" wore a white shirt and blue jean pants. Mr. Calaff notes that he wore a blue T-shirt and white shorts at the time of his arrest. At Mr. Calaff's second trial, Ms. Turner testified that, when she was at a park with her children on July 16, 2010, she saw Mr. Calaff, who wore a white shirt and jeans. Considering that the testimony established that it was hot and that Mr. Calaff was arrested sometime after midnight on July 17, 2010, it is not inconceivable that he changed his outfit from jeans to shorts during the day.

¶ 103   Accordingly, as Mr. Calaff has failed to establish that a motion to suppress the lineup identifications was meritorious, he cannot establish prejudice. See *Henderson*, 2013 IL 114040, ¶ 15. His ineffective assistance claim therefore fails. See *Webb*, 2023 IL 128957, ¶ 21.

¶ 104                                    III. CONCLUSION

¶ 105   For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 106   Affirmed.